**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA        )
                                )
            v.                  )
                                )    Criminal No. 20-218
MANUEL J. MURRIETTA,            )
                                )
            Defendant.          )

**<u>MEMORANDUM OPINION</u>**

Presently before the Court is the Government's motion pursuant to 18 U.S.C. § 3145(a)(1) seeking revocation of a release order issued by United States Magistrate Judge Erik J. Markovich in the District of Arizona, which is opposed by Defendant Manuel J. Murrietta.  (*See* Docket Nos. 131, 393, 435, 445).  After careful consideration of the parties' positions, review of the detention hearing transcript, the referenced Pretrial Services Report and the additional proffered evidence submitted by the parties to supplement the record, (Docket Nos. 393-1, 393-2, 393-3, 418, 445-1, 445-2),  the Government's motion will be granted and detention will be ordered.  The following includes the Court's findings of fact and additional statement of the reasons for detention as required by 18 U.S.C. § 3142(i)(1).

I.      **<u>BACKGROUND</u>**

        A.  **<u>PROCEDURAL HISTORY</u>**

        On August 25, 2020, Defendant and 26 other co-defendants were charged in Count One of the Indictment in this case with conspiracy to possess with intent to distribute and distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846, for conduct occurring from in and around October 2018 until in and around June 2020.  (Docket No. 3).  An arrest warrant was issued for Defendant on that same date.  (Docket No. 23).

1

As outlined in the Government's motion, Defendant surrendered to the United States Marshals Service in the District of Arizona on September 2, 2020, he had an initial appearance there and was ordered to be detained pending a detention hearing.  (Docket No. 131 at 2).  Following a detention hearing held on September 10, 2020,  Magistrate Judge Markovich denied the Government's request that Defendant be detained pending trial and ordered his release on an unsecured personal recognizance bond with conditions.[1]  (Docket No. 226-6).   At the Government's request, Magistrate Judge Markovich stayed the release order until 5 p.m. PST that day to permit the Government to file a motion to revoke the release order.  (Docket No. 418 at 4-5, 8-9)

On September 10, 2020, the Government filed with this Court an emergency motion for a stay and revocation of the release order pursuant to 18 U.S.C. § 3145(a)(1).  (Docket No. 131).  In sum, the Government represented that Defendant "is subject to a rebuttable presumption in favor of detention.  He is unable to rebut it.  The charges against him are serious, his involvement in the conspiracy was significant, and the weight of the evidence is strong.  Defendant's Murrietta's drug-trafficking activity represents his only tie to the Pittsburgh area, where this case is pending.  [Defendant's] release would pose a serious danger to the community.  It would also give rise to an intolerable risk of flight, which could be aided by several conspirators who have thus far managed to evade law enforcement."  (*Id.* at 10-11).  On that same date, this Court granted the Government's motion as to its request that the release order be stayed and further ordered that Defendant shall remain in the custody of the United States Marshals Service and be transported forthwith to the Western District of Pennsylvania for further proceedings on the Government's request that he be detained pending trial or other disposition.  (Docket No. 142).

---

1        The release was conditioned on, *inter alia*, Defendant remaining in Arizona, except to travel to and from this District as required for court appearances.  (*See* Docket No. 226-6).

Following Defendant's arrival in this District, he was arraigned on November 25, 2020 and pled not guilty to the charge. (Docket Nos. 383, 384). The parties were then ordered to file a status report concerning the manner in which they wished to proceed on the Government's motion to revoke the release order. In response, the parties indicated that they would like to submit the matter to the Court by written proffer and evidence with no live testimony.[2] (Docket No. 391). As such, the Court entered an order establishing a briefing schedule and deadlines for the parties to file their written proffers or other evidence for the Court's consideration. (Docket No. 392).

On December 3, 2020, Defendant filed his Proffer and Brief in Support of Motion to Lift Stay of Release Order. (Docket No. 393). Therein, Defendant concedes that the rebuttable presumption of detention applies in this case, but he maintains that he rebutted it because his proffered evidence shows that he is not a danger to the community and he will appear as required. (*Id.* at 5-7). As support, Defendant highlights the following: he and his wife, children and mother are all United States citizens, who live in Nogales, Arizona; as a small business owner, he rented several properties in Nogales, and he also worked as an Uber driver prior to the COVID-19 pandemic; his criminal history is very limited; he has no history of substance abuse; he surrendered to the authorities in this case when he learned of the arrest warrant; and "flight would be an incredibly difficult proposition" given his age and numerous physical ailments. (*Id.* at 5-6). Defendant also submitted letters from his 22-year old daughter, Brigett Murrietta, who is a college student, and his cousin, Jessica Mendez, attesting to his good character and his ties to the community in Nogales, Arizona. (Docket Nos. 393-2; 393-3). Finally, even if Defendant did not rebut the presumption, he submits that he should be released because there are conditions which

---

2       Prior to filing the parties' status report, Defendant filed a motion for detention hearing on November 25, 2020, in which he requested that the Court lift the stay of the release order. (Docket No. 379). Given the Court's ruling detailed herein, Defendant's motion is denied as moot.

can be imposed to assure the safety of the community and his appearance as required, such as placement with a third-party custodian, home detention, electronic monitoring, restrictions on travel and surrendering his passport.  (*Id.* at 7).

On December 11, 2020, the Government filed is Memorandum in Support of its Motion to Revoke the Order of Release, arguing that Defendant's pretrial detention is warranted because he is both a danger to the community and a flight risk and there are no conditions that can be imposed to ameliorate either of those risks.  (Docket No. 435 at 19).  According to the Government, the rebuttable presumption of pretrial detention applies in this case and the relevant factors in 18 U.S.C. § 3142(g) mandate detention.  (*Id.* at 14-18).  In support of its position, the Government maintains that it has strong evidence demonstrating that Defendant was part of an elaborate, multi-national drug trafficking organization ("DTO") responsible for distributing more than 100 kilograms of cocaine obtained from a source of supply in Mexico and sold by its members operating in Pennsylvania, California, Arizona and other states.  (*Id.* at 6, 16). For Defendant's part, he was responsible for transporting narcotics proceeds for the DTO's Los Angeles-based distributors to Mexico.  (*Id.* at 16).  As such, the Government contends that Defendant is a danger to the community given the serious nature of the offense, including that his role in trafficking drug proceeds in this case appears to be similar to his prior conviction for money laundering.  (*Id.* at 18).  The Government also argues that Defendant is a flight risk because he has no ties to the Western District of Pennsylvania, he faces a substantial penalty if convicted and he may seek refuge in Mexico, where he routinely travels.  (*Id.* at 17).

In reply filed on December 15, 2020, Defendant contends that the Government has failed to prove by a preponderance of the evidence that he will flee and by clear and convincing evidence that he will pose a danger to the community if he is released.  (Docket No. 445).  As to flight risk,

Defendant explains that his frequent visits to Nogales, Mexico are not unusual for residents who live in Nogales, Arizona and other border communities. (*Id.* at 1-2). To illustrate his point, Defendant supplied a letter from Mayor Arturo R. Garino of Nogales, Arizona explaining that "the majority of residents on both sides of the border frequently travel between the two [cities]" for dining, nightclubs, grocery shopping, less expensive medical care and to visit family. (Docket No. 445-1). Additionally, Defendant submits that his strong community ties and voluntary surrender in this case "suggest that he has little inclination to flee to Mexico or anywhere else." (Docket No. 445 at 2). Defendant further asserts that the Government has offered no evidence that he will present a danger to the community or play any role in drug-trafficking if released. (*Id.* at 3). To this end, Defendant supplied a chart compiling 2019 federal pretrial violations nationwide which he submits shows that only 1.8% of those released on bond are rearrested. (*Id.*; Docket No. 445-2).

### B.  **EVIDENCE PROFFERED BY THE PARTIES**

The Government proffered five exhibits in support of its motion to revoke the release order in Defendant's case: (1) an Affidavit in Support of an Application for an Order Authorizing the Interception of Wire and Electronic Communications dated February 20, 2020 by Special Agent ("SA") Christopher J. Kline of the United States Postal Service – Office of Inspector General ("Govt. Ex. 1"); (2) excerpts of a series of intercepted calls on February 11, 2020 between co-defendants Manuel Silvestre, Johnny Bravo and Patricia Murrietta, who is Defendant's wife ("Govt. Ex. 2"); (3) a DEA Report of Investigation dated February 19, 2020 regarding surveillance of Bravo and the identification of Defendant and Patricia Murrietta on February 11, 2020 ("Govt. Ex. 3"); (4) surveillance photographs purportedly of Bravo, Defendant and Patricia Murrietta on February 11, 2020 ("Govt. Ex. 4"): and (5) United States Customs and Border Protection records

pertaining to Defendant for the time period from May 3, 2019 until September 1, 2020 ("Govt. Ex. 5").

By way of background, based on information set forth in Govt. Ex. 1, the Court authorized the interception of communications over Target Telephone #1 ("TT #1") and TT #4 utilized by co-defendant Jamaal Maragh, who was identified as the main operative for the DTO in Pittsburgh, as well as TT #5 used by Silvestre and TT #6 used by Bravo. (Govt. Ex. 1, ¶¶ 32, 33, 35). Bravo acted as a distributor/courier of narcotics and drug proceeds for the DTO's unidentified source of supply in Mexico, and he worked in concert with Silvestre, who was based in Los Angeles and was involved in distributing kilogram-quantities of cocaine and collecting large sums of drug proceeds. (*Id.*, ¶¶ 37, 38). Both Silvestre and Bravo were observed by law enforcement accessing a store called Gutierrez Produce located at 741 Kohler Street in Los Angeles, which was a stash house for the DTO. (*Id.*).

Agents intercepted calls between Maragh and the unidentified source of supply in Mexico discussing the trafficking of cocaine from Mexico to the United States. (Govt. Ex. 1, ¶ 53). Agents also intercepted calls between Maragh, Silvestre and Bravo during which they coordinated a money drop on February 4, 2020 and discussed the pricing and payment for drugs (*Id.*, ¶¶ 95-99). In other calls, Maragh ordered kilograms of cocaine from Bravo and the two discussed payment for same, including the fact the money was ultimately intended for the unidentified Mexican source of supply. (*Id.*, ¶¶ 103-112). According to the Government, the intercepted calls show that Bravo and Silvestre distributed drugs on behalf of the Mexican source of supply and worked to collect drug proceeds on his behalf. (Docket No. 435 at 11).

Next, Govt. Ex. 2 is a series of calls intercepted on February 11, 2020 between co-Defendants Patricia Murrietta, Silvestre and Bravo. In the first call between Silvestre and Patricia

Murrietta, Patricia identified herself as "Shakira, on behalf of Negro," (Govt. Ex. 2 at 1), which the Government submits shows that Patricia identified herself as acting on behalf of the unidentified Mexican source of drug supply to the DTO. (Docket No. 435 at 12). During this call, Silvestre said that he could meet in about one hour and advised he would contact "Kambulli." (*Id.* at 2). In a subsequent intercepted call between Silvestre and Bravo, Silvestre referred to Bravo as "Kambulli" and stated that "I am here already I will tell you something soon to give the check to Shakira." (*Id.* at 3). According to the Government, during this call, Silvestre directed Bravo to meet Patricia Murrietta and deliver drug proceeds to her. (Docket No. 435 at 12). Agents next intercepted a call between Silvestre and Patricia Murrietta, during which he asked if the meeting could be arranged for 10:00 a.m. PST. (Govt. Ex. 3 at 5). Thereafter, in another intercepted call between Silvestre and Patricia Murrietta, Patricia indicated that she was at the taco place on 10th. (*Id.* at 6). Finally, in a subsequent call between Bravo and Patricia Murrietta, Patricia indicated that she was waiting for him and eating some taquitos "[r]ight here at the same place. On the 10th. . . . [w]here the liquor store is." (Id. at 7). As the Government explained, this expression indicated that Patricia Murrietta had met Bravo at the same location in the past. (Docket No. 435 at 13).

Govt. Ex. 3 is a DEA Report of Investigation regarding surveillance of Defendant and co-defendants Bravo and Patricia Murrietta conducted on February 11, 2020. In sum, during this surveillance, agents observed a meeting among Defendant, Bravo and Patricia Murrietta during which Bravo provided Defendant with a black backpack believed to contain an undetermined amount of drug proceeds. (Govt. Ex. 3 at 1, 3). More specifically, at 9:10 a.m. on February 11th, SA Kline advised agents in California of intercepted calls indicating that Silvestre, Bravo and UF7894, later identified as Patricia Murrietta, were arranging to meet at 10:00 a.m. that day. (*Id.*, ¶ 1). At approximately 9:10 a.m. on February 11th, electronic surveillance determined that

Silvestre arrived at a stash warehouse located at 741 Kohler Street in Los Angeles used by the DTO, and agents initiated surveillance at that location. (*Id.*, ¶¶ 2, 3). At 9:50 a.m. that morning, SA Kline told investigators that Silvestre was going to send Bravo to meet with Patricia Murrietta (*Id.*, ¶ 4). In a subsequent intercepted call, Bravo and Patricia Murrietta agreed to meet by the Dream Market liquor store, which is in close proximity to 741 Kohler Street. (*Id.*).

At 10:00 a.m. that morning, an agent observed a female, later identified as Patricia Murrietta, along with a male, later identified as Defendant, sitting at a taco stand next to the Dream Market. (Govt. Ex. 3, ¶ 5). Additionally, at 10:00 a.m., Bravo was seen leaving 741 Kohler Street in a white Ford cargo van and arriving at the Dream Market parking lot behind the taco stand. (*Id.*, ¶ 6). An agent observed Defendant and Patricia Murrietta walk toward Bravo's vehicle, Defendant approached Bravo while Patricia Murrietta remained in the driveway area near the parking lot, Bravo exited the van and gave Defendant a black backpack. (*Id.*). Defendant took the backpack, walked across the street and followed Patricia Murrietta to a parked silver Chrysler van, which investigators determined was registered to her at 60 Madison Street, Nogales, Arizona. (*Id.*). An agent saw Patricia Murrietta unlock the van and open the driver's side door for Defendant, who then opened the rear driver's side door and placed the backpack in the back seat. (*Id.*). Defendant entered the driver's side and Patricia Murrietta entered the front passenger side of the van. (*Id.*). After that, agents observed Bravo leave the area and follow the Murrietta's van to eastbound Interstate-10. (*Id.*, ¶ 7).

Govt. Ex. 4 is a series of 12 photographs purportedly of Defendant and co-defendants Bravo and Patricia Murrietta which depict Bravo exiting a van, providing Defendant with a black backpack, Defendant returning to a silver vehicle with Patricia Murrietta, opening the rear driver's side door of the vehicle and placing the backpack inside.

Finally, Govt. Ex. 5 is a record of Defendant's inbound travel from Mexico to the United States compiled by U.S. Customs and Border Protection, which shows that he made 96 trips from Mexico to the United States during the period from May 3, 2019 through September 1, 2020.

As noted, Defendant proffered evidence consisting of character letters from his cousin, Ms. Mendez, and his daughter, Ms. Murrietta.  (Docket Nos. 393-2; 393-3).  Defendant also proffered a letter from Mayor Garino explaining that residents of border communities like Nogales, Arizona where Defendant is from frequently travel to Mexico for shopping, dining and entertainment. (Docket No. 445-1).  Finally, Defendant proffered a pretrial services violation summary report  for 2019.  (Docket No. 445-2).

After reviewing the transcript of the detention hearing before Magistrate Judge Markovich, considering the Pretrial Services Report, the additional evidence proffered by the parties and the arguments of counsel, the Court concludes, for the reasons detailed here, that there is no condition or combination of conditions which will reasonably assure Defendant's appearance as required and the safety of the community if he is released.

## II.   LEGAL STANDARD

The Bail Reform Act of 1984, 18 U.S.C. § 3141, *et seq.* (the "BRA"), governs release and detention pending judicial proceedings.  Pursuant to 18 U.S.C. § 3145(a)(1), "[i]f a person is ordered released by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court . . . the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release. . . ."  A district court exercises *de novo* review over a release order entered by a magistrate judge.  *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985).  "De novo review does not require an additional evidentiary

hearing[,]" and the district court "may make its independent determination based solely upon the evidence introduced at the prior hearing." *United States v. Kolonis*, No. 2:20-cr-0146, 2020 WL 5253192, at *3 (W.D. Pa. Sept. 3, 2020) (quoting *United States v. Burgess*, No. 2:09-cr-150, 2009 WL 2038148, at *2 (W.D. Pa. July 8, 2009)); *see also United States v. Bastianelli*, Crim. No. 17-305, 2018 WL 1015269, at *4 (W.D. Pa. Feb. 22, 2018) ("The Court retains the discretion to make its determination after reviewing the record developed before the U.S. Magistrate Judge or to accept additional evidence from the parties and rule on the expanded record."). The Court may incorporate the transcript of the proceedings before the magistrate judge and does so here. *See United States v. Chagra*, 850 F. Supp. 354, 357 (W.D. Pa. 1994). The Court "may also consider any additional evidence or proffers submitted in conjunction with any supplemental proceedings," which it likewise does here.[3] *Burgess*, 2009 WL 2038148, at *1 (citation omitted).

As noted, the availability of pretrial release is controlled by the BRA, which provides that a defendant must be released on his personal recognizance or upon execution of an unsecured appearance bond unless the court determines that "such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. §3142(b). Following a hearing, if the judicial officer finds that no condition or combination of conditions of release will reasonably assure the defendant's appearance and the safety of the community, detention must be ordered. 18 U.S.C. §3142(e)(1). In determining whether there are conditions of release that will reasonably assure the defendant's appearance and the safety of the community, the judicial officer must consider the § 3142(g) factors concerning:

---

3        As stated, the Court has considered the Pretrial Services Report prepared in the District of Arizona and notes that neither party has objected to the contents of this Report relative to Defendant's background and history as detailed therein.

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including--

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

Certain cases raise a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community. 18 U.S.C. § 3142(e)(3).  This rebuttable presumption applies to cases, among others, in which there is probable cause to believe that the defendant committed an offense under the Controlled Substances Act, 21 U.S.C. § 801, *et seq*., for which the maximum term of imprisonment is ten years or more.  18 U.S.C. § 3142(e)(3)(A).  An indictment charging a defendant with committing an offense enumerated in § 3142(e)(3) is sufficient to establish probable cause triggering the rebuttable presumption.  *United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986).

A defendant may rebut the presumption in § 3142(e) by producing "some credible evidence . . .  that he will appear and will not pose a threat to the community."  *United States v. Carbone*,

793 F.2d 559, 560 (3d Cir. 1986).  The defendant's burden of production is relatively light and has been construed as easy to meet.[4]  *Chagra*, 850 F. Supp. at 357 (citation omitted).  If rebutted, however, the presumption does not disappear but rather "remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."  *Id.* at 358 (citation omitted).  If the defendant rebuts the presumption, the burden of persuasion remains with the Government.  *Id.* at 357.  Thus, the Government bears the burden of proving that the defendant presents either a risk of flight or a danger to the community.[5]

## III.  **DISCUSSION**

As an initial matter, Defendant is charged in Count One of the Indictment with conspiracy to possess with intent to distribute and distribute 5 kilograms or more of cocaine, which carries a penalty of not less than ten years and up to life imprisonment.  *See* 21 U.S.C. § 841(b)(1)(A)(ii). This charge raises the rebuttable presumption that no condition or combination of conditions will reasonably assure Defendant's appearance and the safety of the community.  *See* 18 U.S.C. § 3142(e)(3)(A).  Defendant does not dispute that the rebuttable presumption applies in this case. (*See* Docket No. 393 at 5).

Defendant attempts to rebut this presumption by proffering evidence of the following: his immediate family are all United States citizens, who live in Nogales, Arizona; he has ties to that community as shown by his ownership and rental of several properties there; in addition to his

---

[4]     To rebut the presumption that the defendant presents a danger to the community, "he must come forward with some credible evidence that he will not continue to engage in the drug activities with which he has been charged." *Chagra*, 850 F. Supp. at 358 (citations omitted).  This may be accomplished through "'testimony by co-workers, neighbors, family physician, friends, or other associates concerning the arrestee's character, health, or family situation.'"  *Suppa*, 799 F.2d at 120 (quoting *United States v. Perry*, 788 F.2d 100, 115 (3d Cir. 1986)).

[5]     The Government must prove by a preponderance of the evidence that the defendant is a flight risk and that no condition or combination of conditions will assure his appearance at trial.  *United States v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986).  The Government must prove by clear and convincing evidence that the defendant is a danger to the safety of any other person or the community.  *Delker*, 757 F.2d at 1399.

small business renting properties, he also worked as an Uber driver prior to the COVID-19 pandemic; his criminal history is very limited; he has no history of substance abuse; he voluntarily surrendered to the authorities in this case; and "flight would be an incredibly difficult proposition" given his age and numerous physical ailments. (*See* Docket No. 393 at 5-6). Defendant also submitted letters from his daughter, Ms. Murrietta, and his cousin, Ms. Mendez attesting to his good character and community ties to Nogales, Arizona. (See Docket Nos. 393-2; 393-3). Per the Pretrial Services Report, Ms. Murrietta is willing to serve as a third-party custodian for Defendant is he is released. (*See also* Docket No. 393 at 6). Defendant additionally introduced a letter from Mayor Garino explaining that residents of Nogales, Arizona routinely travel to Nogales, Mexico for shopping, entertainment, dining and even medical treatment, given the close proximity of the two communities. (*See* Docket No. 445-1). Although Defendant admits that he makes "frequent visits" to Nogales, Mexico, he posits that such travel for the purposes described by Mayor Garino is common for individuals who live near the border. (*See* Docket No. 445 at 1-2). Moreover, Defendant claims that "he has little inclination to flee to Mexico or anywhere else" because "his life, his property, his family, and his citizenship are all in the United States." (Docket No. 445 at 2, 3). Overall, Defendant submits that his background and characteristics demonstrate that he is not a danger to the community or a flight risk. (*See* Docket No. 393 at 5-6).

Even if Defendant's proffered information and evidence satisfies his burden to rebut the applicable presumption, the Court nonetheless concludes that the Government has presented clear and convincing evidence that Defendant is a danger to the safety of the community and has proven by a preponderance of the evidence that he is a flight risk. In reaching these decisions, the Court has conducted an independent examination of the record as a whole and balanced the four factors set forth in 18 U.S.C. § 3142(g). For reasons that follow, the Court finds that the available

information and proffered evidence on each of those factors weigh in favor of detention.

**A.   Nature and Circumstances of the Offense Charged**

The Government submits that this case arises from the investigation of a DTO which was responsible for distributing more than 100 kilograms of cocaine that was obtained from a source of supply in Mexico and sold by members of the organization in Pennsylvania, California, Arizona and other states.  (Docket No. 435 at 6).  For Defendant's part, he allegedly transported drug proceeds from the DTO's cocaine trafficking activities from the United States to Mexico.  As a result of Defendant's alleged involvement, he has been indicted on a charge of conspiracy to possess with intent to distribute and distribute 5 kilograms or more of cocaine, which is a very serious controlled substance offense.  (Docket No. 3).  If convicted, he faces a statutory mandatory term of not less than 10 years and up to life imprisonment.  In light of this, the nature and circumstances of the offense charged weigh strongly in favor of pretrial detention.

**B.   Weight of the Evidence**

As a general matter, the Court observes that the weight of the evidence against Defendant is strong, as reflected by the grand jury's return of the  Indictment which establishes probable cause that the offense occurred.  More specifically, while Defendant is presumed innocent of the charged offense, the Government's proffered evidence strongly suggests that Defendant was not only involved in the conspiracy, but he played an important role in the DTO.

The Government's proffered evidence shows that co-defendants Silvestre and Bravo were distributing narcotics for an unidentified source of supply in Mexico and collecting related drug proceeds.  Through intercepted calls and physical surveillance, it was determined that Silvestre arranged a meeting and directed Bravo to transfer drug proceeds to Defendant and his wife, co-defendant Patricia Murrietta, which occurred on February 11, 2020.  According to United States

Customs and Border Protection records pertaining to Defendant, he crossed the border from Mexico to the United States on February 12th, the day after that meeting.  (*See* Govt. Ex. 5 at 2).  The Government submits that Defendant's travel corroborates its evidence that he acted as a courier on behalf of Silvestre, Bravo and their unidentified supplier of cocaine to transport drug proceeds from the United States to Mexico.  Overall, the Government possesses significant evidence of Defendant's involvement in the DTO, particularly as to the events of February 2020.  In sum, while recognizing that Defendant is presumed innocent of the charged offense, the weight of the evidence against him favors pretrial detention.

### C.  **History and Characteristics of Defendant**

As to Defendant's background and characteristics, he is 51 years old, he is a United States citizen, who was born and raised in California and relocated at age 16 with his family to Nogales, Arizona, where he has remained since that time.[6]  Defendant has resided at his current address for eight years with his wife, who is a co-defendant in this case, and their teenage son.  Defendant's daughter, Brigett Murrietta, who is a 22-year old college student, spoke with the Pretrial Services Officer to verify the information contained in the Pretrial Services Report.  As noted, Ms. Murrietta wrote a letter attesting to Defendant's good character, as did Defendant's cousin, Ms. Mendez.  (*See* Docket Nos. 393-2; 393-3).

Defendant and his wife, who is a naturalized United States citizen, have been married for 24 years.  Defendant's father is deceased, his mother lives in Nogales, Arizona, and he has two siblings who reside in Arizona, but he has not had contact with either of them in approximately three years.

---

6       Defendant's background, residence, family ties, employment history, physical and mental health, substance abuse history and criminal history are detailed in the Pretrial Services Report.

Defendant's mental health is good, he reported that he has never used illicit substances, and he only consumes alcohol infrequently during social gatherings.  As for Defendant's physical health, the Report indicates that he has diabetes for which he is prescribed medication.  Defendant submits in his briefing that he also suffers from obesity, hypertension and high cholesterol. (Docket No. 393 at 6).

Prior to the COVID-19 pandemic, Defendant was employed as an Uber driver, earning $600 monthly.  Defendant also receives rental income from several properties he owns and rents in Nogales and Rio Rico, Arizona.  He owns his current residence at E. Madison Street in Nogales where he lives in an apartment and rents additional space there to a restaurant and a dog groomer for which he receives rental income of $400 and $500 per month, respectively.  Although Defendant owes approximately $5,000 in back taxes on this property, he reported that he was not making any payments.  He also owes $30,000 on a mortgage loan for a second property on W. Wise Street in Nogales, which he rents for $450 per month, and he owes $40,000 on a mortgage loan for a third property on Sofia Court in Rio Rico, where he rents three apartments for a combined monthly amount of $1,000.  Defendant owes $4,000 in back taxes on this third property, but he reported that he was not making payments.  Additionally, Defendant has $1,000 in credit card debt for which he makes $40 monthly payments, and he has a $12,000 automobile loan with monthly payments of $440.  Defendant's daughter indicated that he also assists her with her monthly rent of $500.  Overall, despite Defendant's history of employment and receipt of monthly rental income, the Court is concerned that the collective financial burden of his $70,000 in mortgage debt, $9,000 in back taxes and other monthly expenses for his automobile loan, credit card debt and assistance toward his daughter's rent could tempt him to return to the drug trafficking activity with which he has been charged.

Turning to Defendant's criminal history outlined in the Pretrial Services Report, the instant offense is not his first brush with the law.  Defendant was twice convicted in his early 20s on state misdemeanor charges of assault, battery and inflicting corporal injury (spouse/cohabitant) for which he was sentenced in 1989 to 20 days' incarceration and 36 months' probation, and state felony marijuana possession for which he was sentenced in 1992 to two years' probation.  More recently, in 2017 at age 47, he was convicted of a state felony charge of money laundering and sentenced to three years' probation.  Although Defendant's criminal history is not extensive, it appears that the prior probationary sentences he received did not deter him from engaging in much more serious criminal activity as alleged to have occurred in this case.

As to community ties, it is appropriate to consider whether a defendant has ties to the district where the prosecution is pending.  *See United States v. Bucio*, Crim. No. 5:17-055-DCR, 2019 WL 4397334, at *3 (E.D. Ky. Sept. 13, 2019) (the defendant's lack of any community, financial, family or employment ties to the district where prosecution was pending weighed in favor of revoking release order); *United States v. Villegas*, No. 3:11–CR–28, 2011 WL 1135018, at *7 (E.D. Tenn. Mar. 25, 2011) ("[A]lthough the defendant has ties with the community in which he lives in California, the defendant has no ties with this District, and the Court may consider this fact.") (citing *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) (finding that "community" embraces ties to the community in which the charges are brought and the community in the United States to which the defendant has ties)); *United States v. Rivera*, 90 F. Supp. 2d 1338, 1343 (S.D. Fl. 2000) (observing that a court should consider a defendant's ties to the community in which he faces prosecution).  In this case, Defendant has no ties whatsoever to the Western District of Pennsylvania where this case is pending.

The Court recognizes that Defendant has long-standing ties to Nogales, Arizona and his other immediate family members currently live there. Despite Defendant's ties to that community, the Court cannot discount that he routinely travels to Mexico. According to records compiled by the United States Customs and Border Protection pertaining to Defendant, he traveled from Mexico to the United States a total of 96 times in the 16-month period from May 3, 2019 to September 1, 2020. (*See* Govt. Ex. 5). In this Court's estimation, 96 international trips in 16 months qualify as frequent international travel. While the Court understands that individuals who live in close proximity to the border may travel to Mexico to shop, dine and vacation as Defendant notes, the Court agrees with others which have held that frequent international travel, in conjunction with other relevant factors, supports a finding that an individual is a flight risk. *See e.g., United States v. Yusuf*, Crim. No. 4:19-CR-271-SDJ, 2020 WL 607105, at *6 (E.D. Tex. Feb. 7, 2020) (concluding the defendant was a flight risk because he represented his travel as infrequent but he had taken at least thirteen international trips in the past four years, which the court observed cannot be accurately described as "infrequent" travel "[b]y any metric"); *United States v. Ortiz*, Crim. No. 11-251-08, 2013 WL 247226, at *7 (E.D. Pa. Jan. 23, 2013) (concluding that a defendant charged with serious drug offenses who lived in Puerto Rico and traveled to Mexico on three separate occasions in the eighteen months preceding his arrest was a flight risk). Here, Defendant's frequent international travel, in conjunction with his lack of any ties to this District and the substantial term of incarceration he faces if convicted, cause this Court to conclude that he presents a flight risk.[7]

---

[7]     As to flight risk, the Court recognizes there is nothing to suggest that Defendant failed to appear for court appearances as required in his prior state criminal cases, but it is notable that those cases involved state misdemeanors or felonies for which Defendant received probationary sentences. Conversely, the present case concerns his alleged participation in a DTO involving more than 100 kilograms of cocaine and large sums of drug proceeds and, at 51 years old, he is now exposed to a minimum of ten years' imprisonment. In light of the nature of the charged conspiracy and the substantial penalty Defendant faces if convicted, this Court is not persuaded that any amount of bond or other means of personal supervision would deter him from fleeing. *See Chagra*, 850 F. Supp. at 359-60 (given that the

The Court recognizes and appreciates that Defendant's daughter is amenable to serving as third-party custodian for him, but has serious concerns about such an arrangement, regardless of who would assume that role.  Although Defendant's daughter is undoubtedly well-intentioned, the mere fact that she is willing to serve as a third-party custodian does not mean that she, or anyone else, could adequately supervise a defendant who is charged with an extremely serious drug trafficking offense.  *See United States v. Bey*, Crim. No. 15-87, 2015 WL 7176340, at *5 (W.D. Pa. Nov. 13, 2015) ("[T]he mere fact that a relative or other individual is willing to serve as a third party custodian for a defendant is not sufficient to justify release on such conditions but is among the factors to be considered when evaluating whether release or detention is appropriate in a given case.").

Overall, when considering Defendant's history and characteristics (most notably, no ties to the Western District of Pennsylvania, frequent international travel and employment status/financial obligations), this factor weighs in favor of pretrial detention.  *See e.g., United States v. Ruiz-Corral*, 338 F. Supp. 2d 1195, 1198 (D. Colo. 2004) (concluding defendant was a flight risk and revoking magistrate judge's release order, despite that defendant was a United States citizen, had no prior felony convictions, was described as a "dutiful employee" who held a job for five years, had ties to the community and agreed to post his home as security for the bond to secure his appearance, where he was indicted for serious drug conspiracy and weapons charges and had significant family ties to Mexico).

---

defendant faced minimum term of 20 years' imprisonment on drug conspiracy charge, the conspiracy involved large sums of cash, and evidence suggested that he had contacts in Mexico related to his illegal drug activities, the court was not satisfied that any possible conditions of release would reasonably assure the defendant's appearance, as "[e]lectronic monitoring and other means of personal supervision . . . only notify authorities that the defendant is already fleeing").

### D. Nature and Seriousness of Danger to Any Person or the Community if Released

The final factor requires consideration of the nature and seriousness of danger to any person or the community if Defendant is released. As to this factor, the Court recently explained in the case of one of Defendant's co-conspirators that:

> [it] agrees with others which have observed that drug trafficking poses a substantial risk of harm to the community, particularly the trafficking of significant quantities of a dangerous, addictive drug such as cocaine as alleged to have occurred here. *See Bastianelli*, 2020 WL 1015269, at *8 ("Drug trafficking certainly poses a substantial risk of harm to the community, particularly the trafficking of significant quantities of very dangerous and addictive drugs [ ]."); *United States v. Gibson*, 481 F. Supp. 2d 419, 423 (W.D. Pa. 2007) ("[V]iolence is not the only danger to the community this court must consider. The court must also consider the danger of trafficking in illicit drugs."). Distribution of Schedule II controlled substances like cocaine have a "high potential for abuse" and that abuse "may lead to severe psychological or physical dependence." *See Bastianelli*, 2018 WL 1015269, at *8 (citing 21 U.S.C. § 812(b)(2)(A), (C)). Accordingly, the high volume of cocaine allegedly trafficked in this case presents a considerable danger to the safety of the community.

> Ultimately, consideration of this factor requires a court to "*predict* whether defendant will engage in drug trafficking if released pending trial." *United States v. Bratcher*, Crim. No. 14-28, 2014 WL 1371582, at *8 (W.D. Pa. Apr. 8, 2014) (emphasis in original) (citing *Perry*, 788 F.2d at 114 ("[T]he dangerousness determination involves a prediction of the detainee's likely future behavior.").[8] The Court recognizes, as others have, that strict conditions of release, including conditions such as home confinement and electronic monitoring, cannot guarantee that a defendant will no longer engage in criminal activity. *See e.g.*, *Bastianelli*, 2018 WL 1015269, at *8 (citing *United States v. Yarbough*, No. 2:14-cr-270-11, 2014 WL 7343839, *4 (W.D. Pa. Dec. 23, 2014) ("If released to home detention, nothing prevents Defendant from continuing to engage in illegal activity.").

*United States v. Araiza-Vega*, Crim. No. 20-218, 2020 WL 6546136, at *8 (W.D. Pa. Nov. 6,

---

[8]    Given this case law explaining that the dangerousness determination involves a *prediction* of a defendant's likely future behavior, the Court is not persuaded by Defendant's argument that the Government did not offer any evidence that he will pose a danger to the community or that he will play any role in drug trafficking if he is released. (*See* Docket No. 445 at 3). Similarly, Defendant's reference to statistics generally showing that 1.8% of those released on bond in 2019 were rearrested is not necessarily relevant to the Court's consideration of this particular Defendant's specific situation and prediction of his likely future behavior. (*See id.*; *see also* Docket No. 445-2).

2020).

These observations concerning the substantial risk of harm to the community posed by cocaine trafficking equally apply in Defendant's case.  Although the Government's proffered evidence does not indicate that Defendant trafficked cocaine but rather transported the financial proceeds from the DTO's cocaine distribution, one who transports drug proceeds serves a critical function in the ongoing operation of a drug trafficking conspiracy.  Additionally, the Court is troubled by the fact that Defendant was convicted in 2017 on a state felony charge of money laundering and sentenced to three years' probation.  Despite that fairly recent interaction with the criminal justice system, Defendant apparently was not deterred by the probationary sentence he received, proceeded to engage in much more serious criminal activity as alleged here which suggest that he may be inclined to repeat his illicit activity if released.  All told, based on the serious nature of the charge here, along with all of the other factors the Court has considered, the Court finds that the weight of the evidence is such that Defendant's release on bond would pose a serious risk of his continued drug trafficking activities.  As such, this final factor weighs in favor of pretrial detention.

In sum, after considering the record as a whole, including the nature and circumstances of the serious drug offense charged, the weight of the evidence against Defendant, his history and characteristics, the nature and seriousness of danger to the community posed by Defendant's release, and the rebuttable presumption, which retains evidentiary weight, there is no condition or set of conditions which will reasonably assure that Defendant will not engage in drug trafficking activity while on release pending trial or that he will appear as required.  Accordingly, detention must be ordered.

IV.    **<u>CONCLUSION</u>**

Given the Court's finding that no condition or combination of conditions will reasonably assure Defendant's appearance as required and the safety of the community if he is released, the Court will lift its stay of the order of release entered by Magistrate Judge Markovich in the District of Arizona on September 10, 2020, grant the Government's motion seeking revocation of the release order, revoke Defendant's bond and order that he shall be detained pending trial or other disposition of this matter.

An appropriate Order follows.

<u>*s/ W. Scott Hardy*</u>
W. Scott Hardy
United States District Judge

Dated: December 23, 2020

cc/ecf:  All counsel of record
United States Marshal